1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9   SAM MALKANDI,

10          Petitioner,                             CASE NO.  C07-1858-RSM-MJB

11      v.

12   MICHAEL B. MUKASEY, Attorney         REPORT AND RECOMMENDATION
     General, *et al.*,                   RE: INDEFINITE DETENTION

13          Respondents.

14

15          I.  INTRODUCTION AND SUMMARY CONCLUSION

16          Sam Malkandi ("petitioner"), proceeding through counsel, has filed a Petition for Writ of

17   Habeas Corpus pursuant to 8 U.S.C. § 2241, which challenges the constitutional and statutory

18   authority of the U.S. Immigration and Customs Enforcement ("ICE") to detain him any further

19   due to the unlikelihood of his removal from the United States in the reasonably foreseeable

20   future.  (Dkt. #1).   Respondents have filed a Return and Motion to Dismiss arguing that

21   petitioner's detention is warranted because his removal is likely to occur in the reasonably

22   foreseeable future.  (Dkt. #5).

23          After careful review of the entire record, I recommend that petitioner's habeas petition

24   (Dkt. #1) be DENIED and respondents' motion to dismiss (Dkt. #5) be GRANTED.

25   REPORT AND RECOMMENDATION
     RE: INDEFINITE DETENTION
26   PAGE – 1

## II. <u>BACKGROUND AND PROCEDURAL HISTORY</u>

Petitioner was born in Suleymaniya, Iraq in 1958 and was given the name Sarbaz Abulgani Mohammed. (Dkt. #9 at 2971). He is also known by the nickname "Barzan." (Dkt. #9 at 587-88). On October 3, 1997, he submitted a "Registration for Classification as a Refugee" and executed a "Sworn Statement of Refugee Applying for Entry into the United States" in Islamabad, Pakistan. (Dkt. #9 at 2971-76). In support of his refugee application, petitioner made several false statements regarding his past military service, party membership, flight to Iran, imprisonment, and the circumstances surrounding his first wife's death. (Dkt. #9 at 731-34, 2974-75). Petitioner was admitted to the United States as a refugee on June 23, 1998. (Dkt. #9 at 2989-91).

On November 22, 2000, petitioner adjusted his status from refugee to lawful permanent resident. (Dkt. #9 at 2992-3006). In support of his application for adjustment of status, petitioner asserted that he had never sought to procure an immigration benefit by fraud or willful misrepresentation of a material fact. (Dkt. #9 at 2998). Two months later, petitioner legally changed his name to Sam Malkandi. (Dkt. #9 at 194). On July 10, 2003, petitioner filed an application for naturalization. (Dkt. #9 at 3007-22). In support of his naturalization application, petitioner again asserted that he had never lied or given false or misleading information to any United States government official to procure an immigration benefit or entry into the United States. (Dkt. #9 at 3014-17).

On September 30, 2004, petitioner was interviewed by two Federal Bureau of Investigation ("FBI") special agents regarding his naturalization application, and admitted that he had lied about virtually all of the statements he had made on his 1997 refugee application in order to obtain refugee status. (Dkt. #9 at 571, 729-33, 739, 2942, 3034-35, 3087). On July 25, 2005, the Department of Homeland Security ("DHS") denied his naturalization application

REPORT AND RECOMMENDATION
RE: INDEFINITE DETENTION
PAGE – 2

because he had failed to demonstrate that he had been lawfully admitted for permanent resident status.  (Dkt. #9 at 3084-88).

On August 2, 2005, the DHS issued a Notice to Appear, placing petitioner in removal proceedings and charging him pursuant to Section 237(a)(1)(A) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1227(a)(1)(A), as inadmissible at the time of entry or adjustment of status under INA § 212(a)(6)(C)(i), for knowingly making materially false statements on his Registration for Classification as Refugee, Application to Register Permanent Resident or Adjust Status, and Application for Naturalization.  (Dkt. #1, part 2 at 70). Petitioner subsequently applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").  (Dkt. #9 at 3231-45).  On February 11, 2006, the Immigration Judge ("IJ") found petitioner removable as charged.  (Dkt. #9 at 399-400, 1197-1228).  The IJ further determined that petitioner was statutorily ineligible for asylum, withholding of removal, and protection under the CAT.  Petitioner appealed the IJ's decision to the Board of Immigration Appeals ("BIA"), who dismissed the appeal on June 30, 2006.  (Dkt. #9 at 2-11).

Petitioner filed a Petition for Review of the BIA's decision with the Ninth Circuit Court of Appeals, along with a motion for stay of removal.  *Malkandi v. Mukasey*, No. 06-73491 (9th Cir. filed July 12, 2006).  Under Ninth Circuit General Order 6.4(c)(1), this caused a temporary stay of removal to automatically issue.  On January 23, 2007, however, the Ninth Circuit denied petitioner's motion for stay, lifting the temporary stay of petitioner's removal. Petitioner's Petition for Review remains pending in the Ninth Circuit.

A.  Custody Decisions

On August 25, 2005, ICE took petitioner into custody, and determined that he would remain detained pursuant to INA 236(a) pending a final determination by the IJ.  (Dkt. #9 at

REPORT AND RECOMMENDATION
RE: INDEFINITE DETENTION
PAGE – 3

211).  Petitioner requested a bond redetermination hearing by an IJ.  On November 9 and 16, 2005, the IJ conducted a bond hearing and took testimony from several witnesses.  (Dkt. #9 at 534-890).  On November 23, 2005, the IJ denied bond, concluding that petitioner was a flight risk and a threat to national security.  (Dkt. #1, Part 2 at 106-08).  Petitioner appealed the IJ's decision to the BIA, who adopted and affirmed the IJ's decision on May 30, 2006.  *Id.* Specifically, the BIA found that the evidence established that petitioner had misrepresented facts under oath to obtain refugee status and in an attempt to naturalize as a United States citizen.  *Id.*  In addition, the BIA found that the evidence established that petitioner had provided assistance to Tawfiq Bin Attash, also known as Khallad, an Al Qaeda operative who had participated in the attack on the USS Cole, and had lost his leg in Afghanistan participating in a battle with the Northern Alliance.  *Id.*  As the BIA summarized,

> Using the alias "Saleh Saeed Mohammed Bin Yousaf," Khallad applied for a visa to come to the United States, but the application was denied for failing to submit adequate documentation. . . . The 9/11 Commission Report indicates Khallad used the medical need to obtain a prosthetic as a cover story to obtain a visa, and there was a person living in the United States who Khallad used as a point of contact on the visa application.  Although Khallad, when interrogated after arrest, could not remember the name of his contact, he said it sounded like "Barzan." . . . The 9/11 Commission Report specifically surmised that this person was [petitioner], who resided at the address Khallad listed on his visa application as his final destination.  Additionally, although [petitioner] denied knowing Khallad had ties to Al Qaeda, [petitioner] admitted to letting Khallad use [his] address in the visa application, to personally arranging the appointment with a medical facility for Khallad (as evidenced by the Nova Care letter to [petitioner regarding the appointment]), and to speaking over the telephone directly with Khallad to coordinate this appointment.

*Id.*  The BIA noted that had Khallad not been apprehended in Yemen before gaining entry into the United States, he would have participated in the September 11, 2001, attacks on the United States.  *Id.*  The BIA concluded that the IJ "considered appropriate factors and the [custody] decision is correct in light of current case law."  *Id.*

On or about September 27, 2006, ICE conducted a Post Order Custody Review of

REPORT AND RECOMMENDATION
RE: INDEFINITE DETENTION
PAGE – 4

1   petitioner's case while his Petition for Review was pending before the Ninth Circuit and his stay

2   of removal was still in effect.  ICE concluded that petitioner "would pose a threat to the

3   community if released," and determined that he should remain detained while he continues to

4   challenge his removal order in the Ninth Circuit.  (Dkt. #5 at 8).

5          B.  Removal Efforts

6          On February 15, 2007, ICE sent a formal travel document request to the Embassy of Iraq.

7   (Dkt. #6, Attach. A).  On February 20, 2007, Deportation Officer Robert Berg spoke with an

8   official at the Iraqi Embassy who requested petitioner's Iraqi Identification Card, indicating that

9   the Embassy would not issue a travel document without the Iraqi Identification Card.  (Dkt. #6 at

10   2).  On March 9, 2007, Deportation Officer Jaime Alfaro met with Hikmet Bamarni, an Iraqi

11   Embassy official in Washington, D.C., who indicated that he needed to examine original

12   documents to ascertain petitioner's claim to Iraqi citizenship before he could issue a travel

13   document.  *Id.*

14          Petitioner informed ICE that he possessed an Iraqi Identification Card, but that he did not

15   know where it was.  Petitioner stated that he would contact his wife and ask her to search for it,

16   and, if she found it, to provide it to ICE.  *Id.*  Petitioner's counsel later informed ICE that

17   petitioner's wife did not find the card.  *Id.*  In an effort to locate the card, on April 20, 2007, ICE

18   performed a consent search of petitioner's residence, but the card was not located.  *Id.*

19          On June 22, 2007, Officer Alfaro went to the Iraqi Embassy with a representative from the

20   U.S. Department of State, and presented petitioner's original passport to Mr. Bamarni.  Mr.

21   Bamarni requested an interview with petitioner and told Officer Alfaro to return to the Embassy

22   in one week to pick up a newly issued passport for petitioner.  *Id.*

23          On June 25, 2007, Mr. Bamarni conducted a telephone interview with petitioner.  At the

24   conclusion of the interview, Mr. Bamarni confirmed that petitioner is an Iraqi citizen and that the

25   REPORT AND RECOMMENDATION
    RE: INDEFINITE DETENTION
26   PAGE – 5

1   Embassy would be willing to issue petitioner a travel document upon his request.  *Id.*  Rather

2   than requesting a travel document, petitioner's attorney advised Mr. Bamarni that she wanted to

3   speak with him in private and would contact him at a later date.  On July 20, 2007, almost three

4   weeks later, Mr. Bamarni told Officer Alfaro that he was still waiting for a telephone call from

5   petitioner's attorney.  *Id.*

6         On July 25, 2007, petitioner told Officer Berg that he had been unable to reach his

7   attorney since the interview on June 25, 2007, and was unsure whether his attorney had spoken

8   with Mr. Bamarni.  *Id.*  Petitioner indicated that he was interested in returning to Iraq.  *Id.*  On

9   August 30, 2007, Mr. Bamarni informed Officer Alfaro that the Iraq Embassy only needed a

10  signed statement from petitioner requesting a travel document, and asked to speak with

11  petitioner again.  *Id.*

12        On August 31, 2007, petitioner was brought to the ICE Detention and Removal

13  Operations ("DRO") facility in Tacoma, Washington for a telephone call with Mr. Bamarni.  *Id.*

14  Petitioner asked to speak with his attorney before speaking with Mr. Bamarni, and requested that

15  his attorney be permitted to participate in the telephone call with Mr. Bamarni.  *Id.*  Officer Giles

16  reached petitioner's attorney, but was unable to reach Mr. Bamarni.  Petitioner stated that he had

17  "told the Embassy of Iraq previously that he has no intention to go back there."  *Id.*

18        On October 3, 2007, Mr. Bamarni told Officer Alfaro that he had spoken with petitioner's

19  attorney, who stated that petitioner had no interest in obtaining a travel document because he

20  was going to continue to fight his case in an attempt to remain in the United States.  *Id.*

21        On October 4, 2007, Officer Berg presented petitioner with a letter addressed to Mr.

22  Bamarni, requesting the issuance of an Iraqi passport, but petitioner refused to sign the letter.

23  (Dkt. #6, Attach. B).

24        On October 19, 2007, Officer Alfaro went to the Iraqi Embassy with a representative from

25  REPORT AND RECOMMENDATION
    RE: INDEFINITE DETENTION
26  PAGE – 6

the U.S. State Department to meet with Mr. Bamarni.  At that meeting, Officer Alfaro asked Mr. Bamarni what else could be done to obtain a travel document for petitioner.  Mr. Bamarni stated that a signed Iraqi passport application would be sufficient to obtain a passport, but that the application must be signed by petitioner in the presence of a representative of the Iraq Embassy.  *Id.*

On December 6, 2007, Deportation Officer Benny Maxwell called Mr. Bamarni to schedule an appointment for petitioner to meet with an embassy representative to sign the passport application.  *Id.*  However, Mr. Bamarni did not return the call.  On December 14, 2007, Officer Maxwell called Mr. Bamarni again, and was told that the Iraq Embassy policy regarding the issuance of passports and travel documents had changed, and is now controlled by government officials in Baghdad, Iraq.  In addition, Mr. Bamarni stated that petitioner would have to be interviewed at the Embassy and would be required to present an original Certificate of Citizenship and an original Iraqi Civil Document at the time of the interview.  *Id.*

On December 18, 2007, ICE officials located petitioner's original Iraqi documents, including petitioner's Iraqi Identification Card and several other original documents.  *Id.*

On December 27, 2007, Mr. Bamarni advised Officer Maxwell that he would schedule an appointment for petitioner to be interviewed at the Embassy provided that petitioner was willing to attend and complete a passport application, and provide original Iraqi identification documents.  (Dkt. #14).  As of the date of the Government's last pleading, petitioner's interview had not yet been scheduled.  *Id.*  Respondents anticipate that they will escort petitioner to Washington, D.C., for an interview at the Iraqi Embassy in the near future.

III.  DISCUSSION

Section 241(a)(1)(A) of the INA states that "[e]xcept as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United

REPORT AND RECOMMENDATION
RE: INDEFINITE DETENTION
PAGE – 7

1    States within a period of 90 days (in this section referred to as the 'removal period')."  INA §

2    241(a)(1)(A), 8 U.S.C. § 1231(a)(1)(A).  During the removal period, continued detention is

3    required.  INA § 241(a)(2), 8 U.S.C. § 1231(a)(2) ("During the removal period, the Attorney

4    General shall detain the alien.").  Under Section 241(a)(6), the Attorney General may detain an

5    alien beyond the 90-day removal period.  INA § 241(a)(6), 8 U.S.C. § 1231(a)(6).

6        In *Zadvydas v. Davis*, 533 U.S. 678, 121 S. Ct. 2491, 2505, 150 L. Ed. 2d 653 (2001), the

7    Supreme Court considered whether the post-removal-period statute, INA § 241(a)(6), authorizes

8    the government "to detain a removable alien *indefinitely* beyond the removal period or only for a

9    period *reasonably necessary* to secure the alien's removal."  *Zadvydas,* 533 U.S. at 682.  The

10   petitioners in *Zadvydas* could not be removed because no country would accept them.  Thus,

11   removal was "no longer practically attainable," and the period of detention at issue was

12   "indefinite" and "potentially permanent."  *Id.* at 690-91.  The Supreme Court held that INA §

13   241(a)(6), which permits detention of removable aliens beyond the 90-day removal period, does

14   not permit "indefinite detention."  *Id.* at 689-697.  The Court explained that "once removal is no

15   longer reasonably foreseeable, continued detention is no longer authorized by statute."  *Id.* at 699.

16       The Supreme Court further held that detention remains presumptively valid for a period of

17   six months.  *Id.* at 701.  After this six-month period, an alien is eligible for conditional release

18   upon demonstrating "good reason to believe that there is no significant likelihood of removal in

19   the reasonably foreseeable future."  *Id.* at 701.  The burden then shifts to the Government to

20   respond with sufficient evidence to rebut that showing.  *Id*. at 701.  The six-month presumption

21   "does not mean that every alien not removed must be released after six months.  To the contrary,

22   an alien may be held in confinement until it has been determined that there is no significant

23   likelihood of removal in the reasonably foreseeable future."  *Id.* at 701.

24       In this case, the presumptive six-month period in *Zadvydas* expired on or about July 23,

25   REPORT AND RECOMMENDATION
     RE: INDEFINITE DETENTION
26   PAGE – 8

2007.  Consequently, petitioner has been in post-removal-period detention for a period exceeding six months, and his detention is no longer presumptively reasonable.  The Court must, therefore, determine whether petitioner has shown that "there is no significant likelihood of removal in the reasonably foreseeable future," and if so, whether the Government has responded with "evidence sufficient to rebut that showing."  *Zadvydas*, 533 U.S. at 701.  The Court finds that petitioner has failed to satisfy his burden of showing that there is no significant likelihood of removal in the reasonably foreseeable future.

Petitioner argues he has been detained for more than six months pending removal and that the "Iraqi Embassy has refused to issue travel documents due to [ICE's] inability to produce Sam's Iraqi citizenship card."  (Dkt. #1 at 13).  Petitioner claims that he has "supplied all information requested of him by Officer Berg and has made timely and good faith application for travel documents from the Iraqi Embassy, including an application for an Iraqi passport and other travel documents."  (Dkt. #11 at 3).

Respondents argue that petitioner's claim that he has "supplied all information requested of him" is "disingenuous and misleading."  (Dkt. #13 at 2).  Respondents contend that ICE has been in "direct and continuous contact with representatives at the Iraq Embassy, the Embassy has confirmed that Petitioner is an Iraqi citizen, the Embassy is actively processing DHS's request for travel documents, and the Embassy has never indicated that it will not issue a travel document for Petitioner."  *Id.*  According to respondents, all that needs to be done to obtain travel documents for petitioner's removal from the United States is to present the original documents to Iraqi authorities at an interview with Iraqi officials.  (Dkt. #5 at 15).  ICE officials anticipate that they will escort petitioner to Washington, D.C., for the interview and presentation of documents at the Iraq Embassy in the near future.  (Dkt. #5 at 14).  Respondents contend that the only impediment to petitioner's removal is his refusal to request a travel document from the Iraq Embassy.

REPORT AND RECOMMENDATION
RE: INDEFINITE DETENTION
PAGE – 9

1   Respondents assert that petitioner's removal to Iraq is significantly likely in the reasonably

2   foreseeable future.  *Id.*

3          The Court agrees with respondents that petitioner has submitted no evidence to show that

4   his removal is not likely in the reasonably foreseeable future.  Rather, the evidence shows that the

5   Iraq Embassy has specifically advised that it is willing to issue a travel document for petitioner

6   upon his request, but that petitioner has steadfastly refused to cooperate by requesting that the Iraq

7   Embassy issue him a travel document, and that his failure to cooperate has prevented his removal.

8          Notwithstanding *Zadvydas*, pursuant to INA § 241(a)(1)(C), 8 U.S.C. § 1231(a)(1)(C), "the

9   removal period shall be extended . . . and the alien may remain in detention during such extended

10  period if the alien fails or refuses to make timely application in good faith for travel or other

11  documents necessary to the alien's departure . . . ."  In *Pelich v. INS*, 329 F.3d 1057, 1059 (9th Cir.

12  2003), the Ninth Circuit held that "when an alien refuses to cooperate fully and honestly with

13  officials to secure travel documents from a foreign government, the alien cannot meet his or her

14  burden to show there is no significant likelihood of removal in the reasonably foreseeable future."

15  The Ninth Circuit explained that the concerns of indefinite detention underlying the Supreme

16  Court's decision in *Zadvydas* do not exist when the alien "has the 'keys [to his freedom] in his

17  pocket' and could likely effectuate his removal by providing the information requested by the

18  [Government]."  *Pelich*, 329 F.3d at 1060 (citation omitted).  The Court concluded that

19  "Zadvydas does not save an alien who fails to provide requested documentation to effectuate his

20  removal.  The reason is self-evident: the detainee cannot convincingly argue that there is no

21  significant likelihood of removal in the reasonably foreseeable future if the detainee controls the

22  clock."  *Id.*

23         Given petitioner's lack of cooperation, he is unable to show that there is no significant

24  likelihood of removal in the reasonably foreseeable future.  *See Pelich,* 359 F.3d at 1057; *see also*

25  REPORT AND RECOMMENDATION
    RE: INDEFINITE DETENTION
26  PAGE – 10

1  *Lema v. I.N.S.*, 341 F.3d 853, 857 (9th Cir. 2003) (holding that INA § 241(a)(1)(C) authorizes

2  continued detention of a removable alien as long as the alien fails to cooperate fully and honestly

3  with officials to obtain travel documents).  Rather, as the Ninth Circuit found in *Pelich*, petitioner

4  has the keys to his freedom in his pocket and could likely effectuate his removal by simply asking

5  the Iraqi Embassy for assistance in obtaining travel documents.  Accordingly, petitioner's

6  detention is not indefinite.[1]

7                              IV.  <u>CONCLUSION</u>

8           For the foregoing reasons, I recommend that respondents' motion to dismiss be

9  GRANTED, and that the action be dismissed.  A proposed Order accompanies this Report and

10  Recommendation.

11          DATED this 31st day of January, 2008.

12

13

14                                                   _____
                                                     MONICA J. BENTON

15                                                   United States Magistrate Judge

16

17

18

19  _____

20          [1]At the conclusion of his response to respondents' Return and Motion to Dismiss,
    petitioner states that "this Court should continue the hearing on Respondents Return and

21  Motion to Dismiss currently scheduled for January 18, 2008, until such time as the Iraqi
    Embassy's interview has been completed and a decision made on whether travel documents

22  will be issued.  Counsel for Respondents has been contacted and has not objected to the
    continuance." (Dkt. #11 at 3).  Respondents reply that they were contacted but do not consent

23  to petitioner's request to continue the Motion to Dismiss.  (Dkt. #13 at 4).  As petitioner did
    not file a proper motion pursuant to Local Rule CR 7(b), and did not properly note his motion

24  for consideration pursuant to Local Rule CR 7(d)(2)(A), the Court does not address petitioner's
    request to continue respondents' motion to dismiss.

25  REPORT AND RECOMMENDATION
    RE: INDEFINITE DETENTION

26  PAGE – 11